# In the United States Court of Federal Claims

OFFICE OF SPECIAL MASTERS

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

| | | |
|---|---|---|
| JEFFREY A. RIDENOUR, | \* | |
| | \* | No. 21-1392V |
| Petitioner, | \* | Special Master Christian J. Moran |
| | \* | |
| v. | \* | |
| | \* | Filed:  June 2, 2026 |
| SECRETARY OF HEALTH | \* | |
| AND HUMAN SERVICES, | \* | |
| | \* | |
| Respondent. | \* | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

<u>Simina Vourlis</u>, The Law Offices of Simina Vourlis, Columbus, OH, for petitioner;
<u>Emily M. Hanson</u>, United States Dep't of Justice, Washington, DC, for respondent.

## **DECISION DENYING ENTITLEMENT TO COMPENSATION**[1]

Jeffrey Ridenour alleges that an influenza ("flu") vaccine caused him to develop a neurologic condition, transverse myelitis (sometimes "TM").  Mr. Ridenour produced his medical records.  Mr. Ridenour also supported his claim with reports from a neurologist whom he retained, Nizar Souayah.

The Secretary opposes the claim.  The Secretary presented reports from a neurologist whom he retained, Eric Lancaster.  Dr. Lancaster disagrees with two aspects of Dr. Souayah's opinion.  First, Dr. Lancaster contends that Mr. Ridenour did not suffer from transverse myelitis.  Second, Dr. Lancaster also maintains that

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). This means the Decision will be available to anyone with access to the internet. In accordance with Vaccine Rule 18(b), the parties have 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. Any changes will appear in the document posted on the website.

the flu vaccine did not cause the (assumed) transverse myelitis.  After the parties disclosed the opinions of the experts, the parties advocated through briefs.

A review of the evidence and arguments shows that Mr. Ridenour has not established with preponderant evidence a persuasive and reliable medical theory to explain how the flu vaccine can cause transverse myelitis.  Due to this finding, whether Mr. Ridenour showed with preponderant evidence that he suffers from transverse myelitis is not determined.

## I.    Events in Mr. Ridenour's Medical History

### A.    Before Vaccination and Vaccination

Mr. Ridenour was born in 1977.  Exhibit 24.  His remote medical history appears not relevant to determining whether the flu vaccine caused him to suffer transverse myelitis.

On November 15, 2019, Mr. Ridenour underwent an operation to repair a hernia.  The surgeon was Michael Sheehan.  Exhibit 5 at 89-91.  While recovering, Mr. Ridenour missed time from his employment as an IT Tech Support Specialist.

When Mr. Ridenour returned to work, his employer, Bon Secours Mercy Health, required all employees (including him) to receive a flu vaccine.  See Exhibit 22 (Workers' Compensation file) at 74.  Mr. Ridenour received the flu vaccine on December 9, 2019.  Exhibit 1 at 1.  The employer's mandate to receive a vaccination is a foundation for the claim of Workers' Compensation benefits that Mr. Ridenour eventually made.

### B.    December 2019 through February 2020

Three days after the vaccination, Mr. Ridenour returned to Dr. Sheehan.  He complained about perineal pain associated with testicular pain, trouble walking, and difficult and burning urination.  Exhibit 6 at 11 (Dec. 12, 2019).  Dr. Sheehan prescribed an antibiotic.  Id.

Mr. Ridenour saw his family doctor, Jason Hageman, on December 18, 2019.  Mr. Ridenour stated that he had pain in his calves and ankles, which was worse when walking, and leg numbness.  Mr. Ridenour stated that the pain had begun five days earlier when he had stopped taking the antibiotic.  Exhibit 7 at 21; see also Exhibit 2 (affidavit) ¶6.  Dr. Hageman directed Mr. Ridenour to go to the Mercy Health emergency department because of the calf pain.  Exhibit 5 at 101-03.  An ultrasound was normal.  Id. at 103.

Mr. Ridenour returned to Dr. Hageman five days later, complaining about weakness in his right leg. Exhibit 7 at 8. Mr. Ridenour informed Dr. Hageman that he had received the flu vaccine earlier in December. Mr. Ridenour also reported twitching at his left temple, left facial numbness, and left scalp tingling that had begun on December 13, 2019. Dr. Hageman also recorded that Mr. Ridenour had trouble swallowing, abdominal pain, difficulty urinating, weakness, numbness, and headaches. Id. at 9. Because of a concern about a neurologic problem, Dr. Hageman again sent Mr. Ridenour to the Mercy Health emergency department. Id. at 12; see also Exhibit 5 at 111-12.

In the emergency department, Mr. Ridenour reported muscle weakness, tingling mostly in his legs, difficulty walking more than 25 feet, labored breathing, left-sided facial numbness, and scalp tenderness. Exhibit 5 at 111. The doctor in the emergency room consulted a neurologist, Ali Almudallal. Dr. Almudallal recommended a series of tests, including MRIs.

Tests on Mr. Ridenour's blood drawn in the emergency room revealed an elevated white blood count, elevated segs absolute level, and an elevated immature grans level. Exhibit 5 at 132-33.

*MRIs and Other Imaging from December 23, 2019*

Per Dr. Almudallal's recommendations, Mr. Ridenour underwent a series of imaging studies on various parts of his body. Mr. Ridenour's brain was studied via a CT and an MRI. Both were normal. Exhibit 5 at 123, 127.

An MRI of Mr. Ridenour's cervical spine showed multi-level degenerative changes, mostly at the C3-4 level. Exhibit 5 at 121. Although both Dr. Souayah and Dr. Lancaster noted the results of the cervical MRI, neither expert attributed any significance to it.

The more important MRI was the MRI on Mr. Ridenour's thoracic spine. This was conducted with and without contrast. Exhibit 5 at 120. On the initial read, the radiologist stated: "No areas of abnormal enhancement identified." Id. (note created on Dec. 23, 2019 at 9:09 PM). However, when a different radiologist, Michael Walden, reviewed the imaging, Dr. Walden stated: "There is a 2 mm enhancing focus at the right posterior lateral margin of the spinal cord at the T10 vertebral body level," which was "seen only on the sagittal T1 postcontrast sequence." Id. at 119 (note created on Dec. 24, 2019 at 9:44 AM). Dr. Waldren further explained whether the enhanced area was "within the cord parenchyma or at the surface" was "indeterminate." Regardless, in Dr. Waldren's impression, the

3

enhanced area "is unlikely to correlate with the extent of patient's symptoms."  Id.
Dr. Waldren recommended a follow-up MRI with thinner sections in this area.

As part of the discharge plan, Mr. Ridenour was referred to Dr. David
Cooley, who had "discussed C3-C4 herniation with cord involvement" and
"recommend[ed] discharge with steroids."  Exhibit 5 at 116.  The medications
prescribed included prednisone.  Id. at 136.  At discharge, the final impressions
included: sciatica associated with disorder of lumbosacral spine; herniated nucleus
pulposus, C3-4; spasm of muscle; right foot pain, fibromyalgia; bilateral calf pain;
and degenerative disc disease at L5-S1 level.  Id. at 116.

Approximately two weeks later, Mr. Ridenour saw a neurosurgeon, Asem
Salma.  Mr. Ridenour reported improvement, especially in his right foot weakness
and upper body numbness.  Exhibit 8 at 29 (Jan. 3, 2020).  However, Mr. Ridenour
could walk only ten feet before needing to sit down.  Mr. Ridenour stated that,
occasionally, he had shooting pain at his ankles and when the pain was at its worst,
he rated it as a 10/10.  Mr. Ridenour also informed Dr. Salma that he had "chronic"
numbness in the left side of his face.  Dr. Salma stated that Mr. Ridenour had a
"complicated neurological clinical picture" that was difficult to explain by his
current imaging.  Id. at 31.  Dr. Salma, therefore, ordered repeat thoracic and
lumbar MRIs.  Dr. Salma also referred Mr. Ridenour to a specialist in pain
medicine and to a neurologist.

*January 15, 2020 MRIs*

Mr. Ridenour again underwent a series of MRIs.  Exhibit 5 at 139, 142,
149-50.  The MRI of the lumbar spine revealed "pars defects," meaning that the
bones of the lower spine had stress fractures, at L5, and other degenerative
changes.  These results do not meaningfully affect the outcome of Mr. Ridenour's
claim that a flu vaccine caused him to suffer transverse myelitis.

In terms of determining whether Mr. Ridenour suffered from transverse
myelitis, the thoracic MRI is more relevant.  Dr. Walden reviewed the imaging and
compared the results to the MRI from December 23, 2019.  Exhibit 5 at 142.  Dr.
Walden observed a "tiny 2 mm enhancing focus at the surface of the right posterior
lateral aspect of [the] spinal cord is unchanged compared to prior exam."  Id.  Dr.
Waldren stated that this was "nonspecific.  Differential considerations include tiny
meningioma, nerve sheath tumor or venous prominence in the absence of known
malignancy."  Id.

4

As suggested by Dr. Salma, Mr. Ridenour saw a specialist in pain management, Edwin Capulong, on January 20, 2020.  Mr. Ridenour told Dr. Capulong that for two months, he had plantar pain and heel cord tightness.  Exhibit 9 at 49.  Dr. Capulong stated that the imaging on the lumbar MRI did not explain the problems in Mr. Ridenour's legs.  Id. at 53.  Dr. Capulong diagnosed Mr. Ridenour with plantar fasciitis.  Dr. Capulong also referred him to podiatry, ordered physical therapy, and prescribed Naproxen.  Id.

Mr. Ridenour's first session of physical therapy at Mercy Health occurred on January 23, 2020.  Exhibit 5 at 156-58.  The physical therapist documented some abnormalities in Mr. Ridenour's ability to walk.  Mr. Ridenour was using a crutch and reported he also used a cane.

After Dr. Capulong had suggested that Mr. Ridenour see a podiatrist, Mr. Ridenour did see one, Nathan Hensley, on January 29, 2020.  Dr. Hensley obtained a history, reviewed the imaging, and examined Mr. Ridenour.  Dr. Hensley stated that "[c]linically, the majority of [Mr. Ridenour's] symptoms appeared to be either an exacerbation of lower lumbar pain or an exacerbation of [fibromyalgia]."  Exhibit 10 at 6.  Dr. Hensley prescribed low dose prednisone.

Mr. Ridenour returned to the neurologist, Dr. Almudallal, on February 4, 2020.  He reported a right-sided foot drop and bilateral leg weakness persisting for six weeks.  Exhibit 11 at 63.  Mr. Ridenour stated that on the morning he returned to work following the hernia repair, he received a flu vaccine a "few hours prior to onset of symptoms."  Id. at 69.  Symptoms included extreme pain of the perineum and right leg weakness.   Dr. Almudallal's differential diagnosis included "transverse myelitis versus demyelinating process versus infectious process."  Id. at 70.  Dr. Almudallal ordered two more tests (an EMG and a test of the cerebrospinal fluid) and prescribed a muscle relaxant.

An EMG to test both of Mr. Ridenour's lower extremities was performed on February 6, 2020.  The results were normal.  Exhibit 11 at 50-52.

The lumbar puncture to gather cerebrospinal fluid was done on February 17, 2020.  The results ruled out various infectious organisms.  Exhibit 5 at 167-79.

After the tests that Dr. Almudallal had ordered were completed, Mr. Ridenour returned to Dr. Almudallal.  Exhibit 11 at 37 (Mar. 2, 2020).  Mr. Ridenour complained that he was feeling worse with more numbness in his legs, more spasticity in his right upper extremity, and pulling on the left side of his face.

Dr. Almudallal referred Mr. Ridenour to the emergency room for a brain and cervical MRI.  Id. at 42.

In the emergency room, Mr. Ridenour could not "tell registration his name or date of birth."  Mr. Ridenour "knew what he wanted to say but the words wouldn't come out."  Exhibit 5 at 208-09.  Mr. Ridenour "demonstrated a steady, independent gait."  Id. at 214.  The cervical MRI and brain MRI were unchanged. Id.  Laboratory studies on samples taken in the emergency room showed a high white blood count, high red cell distribution width, and high immature granulocytes.  Id. at 226-27.  On the other hand, the discharging doctor stated, "No acute abnormalities [were] found."  Id. at 214.  Mr. Ridenour was discharged to follow up with Dr. Almudallal.

The follow-up appointment with Dr. Almudallal occurred on March 9, 2020. Mr. Ridenour reported a set of symptoms similar to his earlier complaints.  Exhibit 11 at 23.  Dr. Almudallal recommended that Mr. Ridenour see a neurologist at the Cleveland Clinic.  Id. at 29.

Due to the Covid pandemic, the appointment at the Cleveland Clinic was a telemedicine appointment and the doctor who saw Mr. Ridenour was Peter Bambakidis.  Exhibit 12 at 6 (Apr. 9, 2020).  Mr. Ridenour provided a history that is more or less in accord with the events described above.  Dr. Bambakidis wanted to examine Mr. Ridenour and they planned a follow-up visit.

Mr. Ridenour also had an appointment at Mercy Health with a physician's assistant, George Karambellas.  Exhibit 8 at 10 (Apr. 29, 2020).  Mr. Ridenour complained about leg weakness, right foot drop with numbness, and arm tingling and numbness.  Mr. Karambellas suggested that Mr. Ridenour's pars defect could be contributing to his lower extremity symptoms.  Mr. Karambellas ordered a flexion extension x-ray of Mr. Ridenour's lumbar spine.  Id.

As planned, Mr. Ridenour traveled to the Cleveland Clinic to see Dr. Bambakidis in person on May 18, 2020.  When Dr. Bambakidis examined Mr. Ridenour and asked him to stand, Mr. Ridenour did so "very slowly, laboriously and in a seemingly demonstrative fashion."  Exhibit 12 at 12.  When Dr. Bambakidis asked Mr. Ridenour to walk in tandem, Dr. Bambakidis observed that Mr. Ridenour was "quite unsteady but in a somewhat dramatic fashion."  Id.  Dr. Bambakidis stated that his examination failed to show "any definite hard evidence suggestive of an underlying neurologic disease" and there were "features suggestive of at least some degree of elaboration."  Id.  Dr. Bambakidis also wrote: "Giving the patient the benefit of the doubt[,] an autoimmune myelitis would be a

reasonable consideration although it would be difficult to reconcile this diagnosis with a history of facial sensory symptoms."

In the next month, Mr. Ridenour returned to the specialist in pain management, Dr. Capulong, because he was having pain and paresthesia. Exhibit 9 at 37 (June 25, 2020). A cause for the symptoms was degenerative arthritis. Id. at 33. Dr. Capulong also listed transverse myelitis as a diagnosis. Id. at 37. Dr. Capulong prescribed a trial course of gabapentin.

A few days later, Mr. Ridenour telephoned Dr. Bambakidis with questions about starting gabapentin and increasing prednisone. Exhibit 12 at 20 (June 30, 2020). Mr. Ridenour also reported pain in his arms, hands, and legs. In response to Mr. Ridenour's questions, Dr. Bambakidis supported introducing gabapentin but recommended against increasing prednisone. When Mr. Ridenour inquired about what was wrong with him, Dr. Bambakidis answered that the diagnosis was "uncertain and speculative." Id. Although Mr. Ridenour's clinical course suggested a monophasic illness with an inflammatory pathogenesis, there was "little if any significant corroborating evidence on imaging or laboratory studies to suggest this." Id. Mr. Ridenour queried whether his taking Ciprofloxacin, receiving the flu vaccine, or having problems in his lower spine could be the basis for his problems, Dr. Bambakidis responded that identifying the precise etiology was difficult to state with certainty. Id. at 21.

Mr. Ridenour followed up with Dr. Almudallal on August 21, 2020. Exhibit 11 at 15. Dr. Almudallal stated that he could not offer any further testing. Dr. Almudallal, accordingly, recommended that Mr. Ridenour seek assistance from the Cleveland Clinic.

Mr. Ridenour, therefore, messaged Dr. Bambakidis and asked whether there was any treatment for myelitis. Dr. Bambakidis, in turn, referred Mr. Ridenour to a neurologist at the Cleveland Clinic, Samer Saleh. Exhibit 12 at 25.

Mr. Ridenour's first appointment with Dr. Saleh happened on November 18, 2020. Exhibit 13 at 1. He provided a history that differed in some respects.[2] Dr. Saleh reviewed imaging, lab results, and the complaints from Mr. Ridenour. With respect to diagnosis, Dr. Saleh wrote: "Regarding etiology to be determined . . . likely transverse myelitis." Id. at 7. Dr. Saleh ordered a series of tests.

---

[2] For example, Mr. Ridenour stated that he used a wheelchair for several weeks after the vaccination. Exhibit 13 at 1.

On December 1, 2020, Mr. Ridenour applied for benefits from Ohio's workers' compensation system.  Exhibit 22 at 8; see also Exhibit 22.3 at 928 (first report of injury claiming the December 9, 2019 flu vaccination "resulted in autoimmune injuries").  Mr. Ridenour's employer denied the claim.  Exhibit 22 at 22 (entry for 12/30/2020); see also Exhibit 22 at 922 (denying certification of the claim).

As reported as part of the next appointment with Dr. Saleh, a brain MRI was normal and tests for neuromyelitis optica aquaporin-4 antibodies were negative.  Exhibit 13 at 16 (Feb. 8, 2021).  Dr. Saleh examined Mr. Ridenour.  Dr. Saleh detected that Mr. Ridenour had lower extremity weakness, mild tone, down-going toes, and a positive Hoffman's sign.  Dr. Saleh stated that a diagnosis is "likely transverse myelitis which has been reported following flu shots."  Id.  Dr. Saleh referred Mr. Ridenour to physical therapy, increased the dosage of baclofen, and recommended a follow up in six months.

### C.    Reports Generated in the Context of the Workers' Compensation Claim

As part of the proceedings regarding Workers' Compensation benefits, an independent medical examination was conducted by a specialist in internal medicine, Dean Erickson, on March 11, 2011.  Exhibit 23 at 8; see also Exhibit 22.3 at 749 (scheduling appointment).  Based upon the information available to Dr. Erickson, he was asked to state whether Mr. Ridenour's "autoimmune disorder is directly related to Mr. Ridenour's employment with Mercy Health as a result of the flu vaccination on December 9, 2012?"  Exhibit 23 at 11.  Dr. Erickson recommended that the claim not be allowed for three reasons.  First, "the diagnosis of autoimmune disorder does not appear to have been made in medical records" available to Dr. Erickson.  Id.  Second, "there is a definitive lack of information to establish any pathophysiologic mechanism" by which the flu vaccine can cause Mr. Ridenour's "constellation of symptoms and examination findings."  Id.  Third, Mr. Ridenour could suffer from multiple sclerosis, and he did suffer from fibromyalgia.  Id.

Additional medical records were provided to Dr. Erickson, who wrote an addendum on May 24, 2021.  Exhibit 22 at 274-76.  After Dr. Erickson reviewed additional treatment records, he stated that the "neurology specialists indicate that Mr. Ridenour likely does have transverse myelitis."  Id. at 276.  However, according to Dr. Erickson, the treating neurologists only stated that the transverse myelitis was possibly due to the flu vaccine and did not provide a "definitive medical probability statement."  Id.  Dr. Erickson reviewed literature and stated

that these "nationally recognized authorities fail[] to document a definitive causal relationship between autoimmune transverse myelitis and vaccinations." Id.

An internist, Maria Varveris, completed another independent medical examination on June 1, 2021.  Exhibit 14 at 1; Exhibit 22 at 268.  Dr. Varveris stated that Mr. Ridenour's "symptoms are most consistent with the diagnosis of transverse myelitis."  Exhibit 22 at 271.  In her view, Mr. Ridenour did not suffer from multiple sclerosis because, in part, he did not have oligoclonal bands.[3]  As to the causes of transverse myelitis, Dr. Varveris included post-infectious and post-vaccination.  She eliminated "post-infectious" because there was "no evidence of [an] antecedent infectious process." Id.  She also commented that temporal association between the flu vaccination and the onset of neurologic symptoms is "consistent with" the flu vaccine causing the condition.  Thus, she concluded: "it is my medical opinion that the recent administration of the influenza vaccine is more likely than not the causative factor with respect to the injured worker's onset of symptoms which has been diagnosed as transverse myelitis." Id.

Dr. Varveris's opinion was provided to Dr. Erickson.  Exhibit 22 at 141 (June 14, 2021).  Dr. Erickson's June 14, 2021 opinion largely matched the opinion that he had offered on May 24, 2021.  Mr. Ridenour's treating neurologists had diagnosed him with transverse myelitis.  But, there was not sufficient evidence for Dr. Erickson to opine that the flu vaccination caused the transverse myelitis. Exhibit 22 at 143.

Dr. Erickson wrote a third addendum, dated July 24, 2021.  Exhibit 22 at 76-80.  The main point was to address medical articles that were submitted in support of the claim that the flu vaccination caused Mr. Ridenour's autoimmune disorder. Dr. Erickson summarized: these "articles essentially reference broad categories of autoimmune disorder to influenza infections, not vaccinations, as well as possibly other types of vaccinations.  The only association between flu vaccination and the autoimmune disorder transverse myelitis were a total of four case reports. In the scientific community, case reports are interesting but do not prove a causal relationship." Id. at 79.

---

[3] After Dr. Varveris explained why Mr. Ridenour did not have multiple sclerosis, multiple sclerosis appears not to be an issue.  For example, the Secretary did not assert that Mr. Ridenour suffered from multiple sclerosis.  See Resp't's Br.  Similarly, the Secretary did not argue that Mr. Ridenour's fibromyalgia caused his post-vaccination problems.  Id.

District Hearing Officer Darren Biery held a hearing on July 28, 2021.  He reviewed all the evidence and determined that Mr. Ridenour's claim for transverse myelitis was compensable.  Exhibit 22 at 71-72.

The employer appealed.  Exhibit 22 at 70.  Staff Hearing Officer Julie Shaw also allowed the claim for transverse myelitis.  Id. at 23-24 (mailed Nov. 13, 2021).

Following this determination, Mr. Ridenour has received compensation through the Ohio Workers' Compensation system.  See Exhibit 32 at 1 (finding that Mr. Ridenour qualified for a permanent partial impairment award of 52 percent).  However, medical records generated after 2021 do not meaningfully assist in determining whether Mr. Ridenour suffered from transverse myelitis and, if so, whether the December 9, 2019 vaccination caused it.

Dr. Saleh completed a "Medical Source Statement."  Exhibit 34 (June 3, 2022).  It appears that this form may have been generated in the context of the Workers' Compensation claim.  In any event, when asked to state whether Mr. Ridenour has transverse myelitis, Dr. Saleh checked a box for "yes."  Id. at 1 (item 2).

## II.    Procedural History

Mr. Ridenour initiated this case by filing his petition on May 25, 2021.  He periodically submitted medical records as well as material from his Workers' Compensation claim.  He also submitted affidavits. Exhibits 26-28.

The Secretary reviewed this material and recommended that compensation be denied.  Resp't's Rep., filed Mar. 17, 2022.  Because the parties were likely to retain experts, a set of instructions were issued.  See Order, issued July 12, 2022. Thereafter, the parties filed a series of reports from experts.[4]  Mr. Ridenour presented three reports from Dr. Souayah.  Exhibit 40 (filed Jan. 31, 2023); Exhibit 71 (filed June 26, 2023); Exhibit 107 (filed Oct. 23, 2023).  The Secretary relies upon reports from Dr. Lancaster.  His reports are Exhibit A (filed Mar. 28, 2023); Exhibit C (filed Aug. 23, 2023).

After the parties completed the disclosure of opinions from experts, the next step was for the parties to file briefs.  Order, issued May 21, 2024.  Mr. Ridenour

---

[4] While the parties were filing reports from experts, Mr. Ridenour updated the record with more medical records and more documents originating in the Workers' Compensation context. However, this material does not meaningfully affect the outcome of the claim.

advocated through a primary brief, filed on November 18, 2024, and a reply, filed on March 4, 2025.  In between, the Secretary filed his single brief on January 16, 2025.  The case is ready for adjudication.

## III.   <u>Standards for Adjudication</u>

A petitioner is required to establish his case by a preponderance of the evidence.  42 U.S.C. § 300aa-13(1)(a).  The preponderance of the evidence standard requires a "trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he] may find in favor of the party who has the burden to persuade the judge of the fact's existence."  <u>Moberly v. Sec'y of Health & Hum. Servs.</u>, 592 F.3d 1315, 1322 n.2 (Fed. Cir. 2010) (citations omitted).  Proof of medical certainty is not required.  <u>Bunting v. Sec'y of Health & Hum. Servs.</u>, 931 F.2d 867, 873 (Fed. Cir. 1991).

Distinguishing between "preponderant evidence" and "medical certainty" is important because a special master should not impose an evidentiary burden that is too high.  <u>Andreu v. Sec'y of Health & Hum. Servs.</u>, 569 F.3d 1367, 1379-80 (Fed. Cir. 2009) (reversing a special master's decision that petitioners were not entitled to compensation); <u>see also</u> <u>Lampe v. Sec'y of Health & Hum. Servs.</u>, 219 F.3d 1357 (Fed. Cir. 2000); <u>Hodges v. Sec'y of Health & Hum. Servs.</u>, 9 F.3d 958, 961 (Fed. Cir. 1993) (disagreeing with the dissenting judge's contention that the special master confused preponderance of the evidence with medical certainty).

Mr. Ridenour's case raises two distinct issues.  First, the parties disagree as to whether he has established that transverse myelitis is an appropriate diagnosis.  For the reasons set out in Section IV below, this issue is not resolved.  Resolving how the evidence preponderates is not required due to the second issue.  The second is whether Mr. Ridenour has established that the flu vaccine was the cause-in-fact of his (assumed) transverse myelitis.  For the reasons set out in Section V below, the evidence does not preponderate in Mr. Ridenour's favor.  Thus, compensation is denied.

## IV.   <u>Analysis of First Issue --- Diagnosis</u>

Whether the evidence preponderantly supports a diagnosis of transverse myelitis is difficult to say.  Some evidence, including the reports from Dr. Souayah and the statements of some treating doctors, favors a diagnosis of transverse myelitis.  Other evidence, including the reports from Dr. Lancaster and the statements of other treating doctors, are contrary.  Due to several questions, the undersigned declines to resolve this question based upon the present record.

11

The evaluation of diagnosis consists of five steps.  Part A sets out the diagnostic criteria for transverse myelitis.  Part B reviews the opinions of the experts the parties have retained, Dr. Souayah and Dr. Lancaster.  Part C reviews the various statements by doctors who treated Mr. Ridenour over the years.  Part D comments upon the result of the Ohio Workers' Compensation proceeding.  Part E evaluates all this evidence to explain why a finding regarding diagnosis is not being reached.

A.    **Diagnostic Criteria**

A Working Group from the American Academy of Neurology defined the criteria for diagnosing transverse myelitis.  The diagnostic criteria for transverse myelitis are, as the Working Group set forth:

> 1. Development of sensory, motor, or autonomic dysfunction attributable to the spinal cord;
>
> 2. Bilateral signs and/or symptoms (not necessarily symmetric);
>
> 3. Clearly defined sensory level;
>
> 4. Exclusion of extra-axial compressive etiology by neuroimaging (MRI or myelography; CT of spine not adequate);
>
> 5. Demonstration of spinal cord inflammation by cerebrospinal fluid pleocytosis or elevated IgG index, or MRI revealing a gadolinium-enhancing cord lesion; and
>
> 6. Progression to nadir of clinic deficits between 4 hours and 21 days after symptom onset;

See Exhibit B-2 at 500 (Table 1).

12

### B.    Opinions of Retained Experts[5]

Relying upon the opinions of Dr. Lancaster, the Secretary contends that Mr. Ridenour did not satisfy three of the criteria. Resp't's Br. at 17-18. These are discussed below.

### 1.    Clearly Defined Sensory Level

After reviewing Mr. Ridenour's medical records, Dr. Lancaster opined in his first report that "[t]here is no clearly defined sensory level." Exhibit B at 10. He pointed out that "examinations have reported a stocking-glove pattern of sensory changes or other patterns." Id. In this context, Dr. Lancaster did not identify the medical records supporting his statement but in Dr. Lancaster's recitation of events about Mr. Ridenour, Dr. Lancaster cited a May 9, 2022 report from Dr. Kennington. Exhibit B at 9, citing Exhibit 38.

In Dr. Souayah's second report, he recounted that on December 23, 2019, a neurological examination "revealed sensory deficit." Exhibit 71 at 3. Although Dr. Souayah did not cite a medical record in this context, Dr. Souayah's first report recounted Dr. Hageman's December 23, 2019 medical record. Exhibit 40 at 11, citing Exhibit 7 at 8-12.

Dr. Hageman's report appears to be the only report created in 2019 or 2020 that discusses a sensory problem. For example, the neurologist Dr. Almudallal saw Mr. Ridenour on March 2, 2020 and Dr. Almudallal reported, among other problems, numbness, hyperreflexia, and spasm. Exhibit 11 at 37-42. However, there is no persuasive evidence that numbness, hyperreflexia, or spasm is the same as a sensory problem. Likewise, when Dr. Bambakidis evaluated Mr. Ridenour at the Cleveland Clinic on May 18, 2020, Dr. Bambakidis did not record anything about a sensory problem or the lack of a sensory problem. See Exhibit 11 at 14-15. Thus, there appears to be a lack of information about sensory problems, except for Dr. Hageman's December 23, 2019 report.

Crediting Dr. Lancaster's criticism is difficult. Dr. Lancaster properly notes that Mr. Ridenour was reported to have a stocking-glove pattern of sensory changes. However, this report was made in 2022, approximately two years after the critical time during which Mr. Ridenour may have had (or may not have had)

---

[5] Arguably, the doctors from the Workers' Compensation proceeding, Dr. Varveris and Dr. Erickson could be categorized as "retained" experts. However, because they were not retained in context of the Vaccine Program, their opinions are considered in part D below.

transverse myelitis.  Dr. Lancaster has not explained how such a dated report can be useful in making a retrospective diagnosis.  Furthermore, Dr. Lancaster did not cite medical records that document "other patterns" of sensory changes.  Without clarification from Dr. Lancaster, his opinion regarding (a lack of) clearly defined sensory level cannot be accepted.

Flaws in Dr. Lancaster's opinion, however, do not necessarily enhance the opinion offered by Dr. Souayah.  As stated above, Dr. Souayah seems to be relying upon a vague report from Dr. Hageman.  Dr. Souayah has not addressed whether the clearly defined sensory level should persist, nor has he addressed the treatment records that fail to show any other doctor documenting a clearly defined sensory level.

Therefore, when there is so much uncertainty, the undersigned declines to find how the evidence preponderates.

### 2.    Demonstration of spinal cord inflammation

The next criterion ("demonstration of spinal cord inflammation") can be demonstrated in one of two ways---either a test on the cerebrospinal fluid or an MRI.  Both are disputed here.

Cerebrospinal Fluid.  In Mr. Ridenour's opening brief, he maintained that he met this aspect due to a test performed on December 23, 2019, which showed that he had an elevated white blood count.  Pet'r's Br. at 21, citing Exhibit 5 at 132-33.  However, the Secretary easily defeats this argument by pointing out that the December 23, 2019 test was performed on Mr. Ridenour's blood, not his cerebrospinal fluid.  Resp't's Br. at 17, citing Exhibit 5 at 132-33.

A relevant test was performed on February 17, 2020, when Mr. Ridenour underwent a lumbar puncture.  Exhibit 5 at 167.  Immunoglobulin G was normal (2.1 mg/dL with an expected range of 0.0 to 6.0).  Id. at 170.  The percentage of lymphocytes was higher than expected (100 percent with an expected range of 0-90 percent).  Id. at 175.

The significance, if any, of these results is not readily apparent.  Mr. Ridenour returned to his neurologist, Dr. Almudallal, on March 2, 2020 "to discuss results of testing performed."  Exhibit 11 at 37.  Although Dr. Almudallal's record includes the results of his complete blood count (see Exhibit 11 at 38-39), this portion of Dr. Almudallal's record does not include the results of any studies on Mr. Ridenour's cerebrospinal fluid.  Thus, it is not possible to say whether Dr. Almudallal found the percentage of lymphocytes significant.

14

The Secretary pointed out that another doctor, Dr. Bambakidis, did comment on the results of the spinal tap when Dr. Bambakidis spoke with Mr. Ridenour as part of a telephone call on April 9, 2020.  Resp't's Br. at 17, citing Exhibit 12 at 6.  Within the "H&P" [probably "history and physical," although no physical exam was conducted], Dr. Bambakidis wrote: a "cerebrospinal fluid analysis was performed in late February 2020 which was unremarkable although the percentage of lymphocytes was a bit increased."  Exhibit 12 at 6.  Whether Dr. Bambakidis actually reviewed the laboratory results is not entirely clear as his record contains some results from the tests on the cerebrospinal fluid but not the measurement of percentage of lymphocytes.  See Exhibit 12 at 38-39.

In response to the Secretary's citation to Dr. Bambakidis, Mr. Ridenour countered that Dr. Bambakidis also stated that Mr. Ridenour's history suggests "a diffuse upper motor neuron pathologic process, most likely at the spinal level of inflammatory etiology."  Pet'r's Reply at 4, citing Exhibit 12 at 6-7.  However, the value of this proposition is diminished because in the next sentence, Dr. Bambakidis wrote: "we really need to examine the person in order to proceed in an optimal fashion."  Exhibit 12 at 7.  Thus, the statements of the treating doctors shed little light on the meaning, if any, of the higher-than-expected percentage of lymphocytes.

The doctors retained in this litigation, also, offer little help in their written reports.  Dr. Souayah stated that Mr. Ridenour's "cerebrospinal analysis showed high lymphocytes."  Exhibit 40 at 21.  For his part, Dr. Lancaster discussed the results of the spinal tap in one paragraph.  Exhibit B at 5.  However, Dr. Lancaster did not note the elevation in the percentage of lymphocytes.

Due to the lack of clarity, the undersigned declines to say how the evidence regarding the sub-criterion of cerebrospinal fluid pleocytosis preponderates.

MRI.  Mr. Ridenour underwent two MRIs of his thoracic spinal cord.  Both were interpreted by Michael Walden.  See Exhibit 5 at 119-20 and 142.

The first MRI was originally read by a different doctor at approximately 9:00 in the evening on December 23, 2019.  This doctor stated: "No areas of abnormal enhancement identified."  Exhibit 5 at 120.  Then, approximately 12 hours later, Dr. Walden interpreted the images.  Dr. Walden found that "There is a 2 mm enhancing focus at the right posterior lateral margin of the spinal cord at the T10 vertebral body level."  Id. at 119.  He stated "This is indeterminate whether is within the cord parenchyma or at the surface.  This is unlikely to correlate with the extent of the patient's symptoms."  Id.  Dr. Walden recommended a repeat MRI.

15

The second MRI was performed on January 15, 2020. Dr. Walden was the only radiologist to write a report. Dr. Walden stated: "A tiny 2 mm enhancing focus at the surface of the right posterior lateral aspect of [the] spinal cord is unchanged compared to prior exam." Exhibit 5 at 142. Dr. Walden wrote: "This is nonspecific. Differential considerations include tiny meningioma, sheath tumor or venous prominence in the absence of known malignancy." Id.

It appears that the treating doctors offered little comment about the finding at T10. Dr. Souayah identified two treaters, who discussed the thoracic MRIs. See Exhibit 40 at 13.

The first doctor was neurosurgeon Asem Salma on January 3, 2020. Exhibit 8 at 28. As of this date, only one of the two thoracic MRIs had been performed. Although Dr. Salma's history recites that during the emergency room visit, Mr. Ridenour "underwent several spine imaging studies," Dr. Salma seemed to focus on the results of the lumbar MRI, which showed a pars defect at L5-S1. Exhibit 8 at 28-29. Dr. Salma's January 3, 2020 report does not mention that lesion found at T10. However, Dr. Salma did request another MRI of the thoracic spine. Id. at 31.

After the second thoracic MRI was performed, Dr. Salma saw Mr. Ridenour in follow-up on February 5, 2020. Dr. Salma's report reiterates Dr. Walden's finding about the enhancement at T10. Exhibit 8 at 19. However, Dr. Salma appears not to have attributed any significance to it. Dr. Salma requested further testing of the problem in Mr. Ridenour's lumbar spine. Id. at 20.

The second doctor whom Dr. Souayah identified as commenting upon the thoracic MRIs is Dr. Capulong, the specialist in spine medicine and pain management. Following a visit on January 20, 2020, Dr. Capulong stated: "MRI of the T spine reviewed -- looks like intradural, extramedullary, enhancing tumor at T10 level, 2 mm lesion. Will defer to Neurosurgery for comment." Exhibit 9 at 53. (The neurosurgery consult was with Dr. Salma and is described in the previous paragraph). Thus, it appears that the treating doctors were not very concerned about the T10 lesion.[6]

In the context of litigation, the experts offer little help. Dr. Souayah relies upon the T10 finding as part of his explanation for the diagnosis of transverse myelitis. Exhibit 40 at 20-21. However, Dr. Souayah fails to address Dr. Walden's suggestion that the lesion was not within the primary part of the spinal

---

[6] Dr. Lancaster asserted that "Dr. Capulong thought the MRI abnormality was likely a tumor." Exhibit B at 11.

cord. On the other hand, Dr. Lancaster states that the T10 lesion "was likely not a lesion inside the cord itself." Exhibit B at 10. Dr. Lancaster goes further in his second report: "the spinal cord lesion was described as being on the surface of the cord." Exhibit C at 2. Dr. Lancaster could have explained the basis for his conclusions as Dr. Walden, the radiologist who reviewed the MRI, stated that whether the lesion was inside the cord was "indeterminate." Exhibit 5 at 119.

On the present record, the undersigned declines to find whether Mr. Ridenour had a lesion in his spinal cord. If more were required, the undersigned would likely urge the parties to obtain the original MRI images and to retain neuroradiologists. Additionally, the parties and their experts could present articles about the size of a lesion in transverse myelitis as it is not clear that a lesion that is only 2 mm would cause problems.

### 3.    Peak of Symptoms within 21 Days

The final disputed criterion concerns the evolution of problems. The diagnostic criteria requires that the symptoms progress to nadir between 4 hours and 21 days of onset. This distinguishes cases of acute transverse myelitis from an ischemic etiology or a rapidly evolving vascular myelopathy (if symptoms reach nadir in under 4 hours) as well as from "a slowly progressive or stuttering hereditary myelopathy, spinal cord tumor, myelopathy due to a dural arteriovenous fistulas, and a chronic progressive form of [multiple sclerosis] (all longer than 21 days of progression)." Exhibit B-2 at 501.

The Secretary aptly presents the nature of the dispute: "The parties dispute the precise date of onset here, but agree that onset occurred sometime between December 9 and December 13, 2019. This would place the end of the twenty-one-day window between December 30, 2019, and January 3, 2020. The extensive medical record shows that petitioner's condition continued to fluctuate well after this period." Resp't's Br. at 18 (paragraphing eliminated without notation).

To evidence a worsening beyond January 3, 2020, the Secretary points to three medical records. Resp't's Br. at 18-19. These are (1) Dr. Almudallal's March 23, 2020 record in which Dr. Almudallal memorialized complaints that Mr. Ridenour's lower extremity numbness and upper extremity spasticity had worsened; (2) Dr. Bambakidis's June 30, 2020 record in which Dr. Bambakidis memorialized complaints that Mr. Ridenour had increased pain in his arms, hands, and legs; and (3) Dr. Kennington's May 9, 2022 record in which Dr. Kennington documented a decrease in Mr. Ridenour's arm strength.

17

Mr. Ridenour's rebuttal is that he developed problems in his arms and hands because he was using crutches.  Pet'r's Reply at 7.

Again, the record is not especially clear.  Mr. Ridenour has a fair point that problems in his arms derive from his use of crutches.  However, the Secretary's argument is not based only upon trouble in Mr. Ridenour's upper extremities.  The Secretary has cited evidence in which the treating doctors noted increased problems in Mr. Ridenour's lower extremities as well.

### C.    Treating Doctors

The opinions of treating doctors can be quite probative.  Cappizano v. Sec'y of Health & Hum. Servs., 440 F.3d 1317, 1326 (Fed. Cir. 2006).  The views of treating doctors about the appropriate diagnosis are often persuasive because the doctors have direct experience with the patient whom they are diagnosing.  See McCulloch v. Sec'y of Health & Hum. Servs., No. 09-293V, 2015 WL 3640610, at *20 (Fed. Cl. Spec. Mstr. May 22, 2015).  However, the views of a treating doctor are not absolute, Snyder v. Sec'y of Health & Hum. Servs., 88 Fed. Cl. 706, 745 n.67 (2009), even on the question of diagnosis, R.V. v. Sec'y of Health & Hum. Servs., 127 Fed. Cl. 136, 141 (2016), appeal dismissed, No. 16-2400 (Fed. Cir. Oct. 26. 2016).

The views of treating physicians should also be weighed against other, contrary evidence present in the record—including conflicting opinions among such individuals.  Hibbard v. Sec'y of Health & Hum. Servs., 100 Fed. Cl. 742, 749 (2011) (finding that it is not arbitrary or capricious for special masters to weigh competing treating physicians' conclusions against each other), aff'd, 698 F.3d 1355 (Fed. Cir. 2012); Veryzer v. Sec'y of Health & Hum. Servs., No. 06-522V, 2011 WL 1935813, at *17 (Fed. Cl. Spec. Mstr. Apr. 29, 2011), mot. for rev. denied, 100 Fed. Cl. 344, 356-57 (2011), aff'd without op., 475 Fed. App'x 765 (Fed. Cir. 2012).

Here, details of multiple medical records are set forth above.  With respect to the question of diagnosis, the following chart encapsulates the views of the treaters.  (For frame of reference, Mr. Ridenour's vaccination was on December 9, 2019.)

18

| Date | Professional, specialty, and facility | Note | Exhibit and Page |
|---|---|---|---|
| 12/23/2019 | Ali S. Almudallal, neurologist, Mercy Health--St. Rita's Medical Center | In the emergency room, Dr. Almudallal ordered MRIs | 5 at 116 |
| 12/24/2019 | Michael Walden, radiologist, Mercy Health--St. Rita's Medical Center | Thoracic MRI showed T10 lesion | 5 at 119 |
| 1/3/2020 | Asem Salma, neurosurgeon, Mercy Health--St. Rita's Medical Center | Complicated neurologic picture; Dr. Saleh recommended a repeat MRI | 8 at 31 |
| 1/15/2020 | Michael Walden, radiologist, Mercy Health--St. Rita's Medical Center | Thoracic MRI showed T10 lesion | 5 at 142 |
| 1/20/2020 | Edwin Capulong, spine medicine / pain management & rehabilitation specialist, Mercy Health--St. Rita's Medical Center | Recommended physical therapy | 9 at 53 |
| 2/4/2020 | Ali S. Almudallal, neurologist, Mercy Health--St. Rita's Medical Center | Differential included transverse myelitis | 11 at 70 |
| 3/2/2020 | Ali S. Almudallal, neurologist, Mercy Health--St. Rita's Medical Center | Dr. Almudallal sent Mr. Ridenour to the emergency room due to complaints about arms and face | 11 at 37 |

| Date | Professional, specialty, and facility | Note | Exhibit and Page |
|---|---|---|---|
| 4/9/2020 | Peter Bambakidis, neurologist, Cleveland Clinic | Upper motor neuron pathologic process | 12 at 6 |
| 5/18/2020 | Peter Bambakidis, neurologist, Cleveland Clinic | No "definitive hard evidence suggestive of an underlying neurologic disease" and "an autoimmune myelitis would be a reasonable consideration although it would be difficult to reconcile this diagnosis with a history of facial sensory symptoms" | 12 at 12 |
| 6/25/2020 | Edwin Capulong, spine medicine / pain management & rehabilitation specialist, Mercy Health--St. Rita's Medical Center | Changed diagnosis to transverse myelitis | 9 at 39 |
| 7/1/2020 | Peter Bambakidis, neurologist, Cleveland Clinic | The diagnosis was "uncertain and speculative" | 12 at 20 |
| 11/18/2020 | Samer Saleh, neurologist, Cleveland Clinic | Diagnosis was "to be determined . . . likely transverse myelitis" | 13 at 7 |
| 2/8/2021 | Samer Saleh, neurologist, Cleveland Clinic | "likely transverse myelitis" | 13 at 16 |
| 6/3/2022 | Samer Saleh, neurologist, Cleveland Clinic | Medical source statement, confirming transverse myelitis | 34 at 1 |

As illustrated in this chart, for approximately six months after the start of Mr. Ridenour's problems, his doctors did not reach any consensus about a diagnosis.  For example, after Mr. Ridenour underwent two thoracic MRIs, the treating neurologist (Dr. Almudallal) included transverse myelitis as among the potential considerations.  See Exhibit 11 at 70.  Dr. Bambakidis's May 18, 2020 report is strong evidence about the uncertainty as he wrote that there was no "definitive hard evidence suggestive of an underlying neurologic disease."  Exhibit 12 at 12.

But, after approximately six months, the doctors tended to coalesce around transverse myelitis.  The first doctor to assign Mr. Ridenour as suffering from transverse myelitis was Dr. Capulong on June 25, 2020.  Exhibit 9 at 39.

The Secretary is critical of Dr. Capulong's report because he did "not provide an explanation for this diagnosis."  Resp't's Br. at 19.  Mr. Ridenour replies that Dr. Capulong, "a trained physician, had taken an extensive history of petitioner, reviewed petitioner's prior medical records, performed an examination and used his education training and experience to diagnosis petitioner with TM after this visit."  Pet'r's Reply at 4-5.

To some degree, both parties are correct.  However, Mr. Ridenour may be reading more into Dr. Capulong's records than is present.  For example, the history in this visit is presented in about seven lines.  Exhibit 9 at 33.  So, "extensive" might not be the best descriptor for it.  Likewise, the neurologic portion of the physical exam is contained in two lines.  These are: "General: No focal deficit present" and "Mental Status: He is alert and oriented to person, place, and time." Id. at 37.  Aspects of a neurologic exam that are often found in evaluation of a person with transverse myelitis, such as measuring sensory function and strength/weakness are absent.[7]  Nonetheless, Mr. Ridenour is indisputably correct that Dr. Capulong did diagnose Mr. Ridenour as suffering from "Transverse myelitis."  Id.

At the same time, the basis or explanation for the diagnosis is not readily apparent.  When Dr. Capulong had previously seen Mr. Ridenour on January 20, 2020, Dr. Capulong did not diagnose transverse myelitis.  The three diagnoses on

---

[7] For an example of a neurologist's neuromuscular examination, see Exhibit 13 at 4.

that day were: (1) plantar fasciitis, bilateral; (2) pars defect of lumbar spine; and (3) fibromyalgia. Exhibit 9 at 53.

It is not readily apparent why Dr. Capulong changed the diagnoses. Dr. Capulong's medical records include one report from an outside doctor, Nathan Hensley, the podiatrist. See Exhibit 9 at 46 (Jan. 29, 2020). But, Dr. Hensley did not diagnose Mr. Ridenour with transverse myelitis. Thus, the updated information from Dr. Hensely does not explain Dr. Capulong's switch in diagnoses. In the absence of clarifying information from Dr. Capulong, crediting his new diagnosis is difficult. See Giesbrecht v. Sec'y of Health & Hum. Servs., No. 16-1338V, 2023 WL 2721578, at *6 (Fed. Cl. Spec. Mstr. Mar. 30, 2023) (declining to credit the finding of a treating doctor whose reports changed from possible PMR to PMR without explanation).

Dr. Capulong's diagnosis of transverse myelitis appears to carry forward. In Mr. Ridenour's first appointment with Dr. Samer Saleh, the report begins with a statement that Mr. Ridenour is being seen for "Myelitis." Exhibit 13 at 1 (Nov. 18, 2020). Mr. Ridenour also stated, as part of the history of present illness, that "He saw a neurologist at Lima who told him that he has inflammation of the spinal cord and advised him to see a neurologist at the clinic." Id. However, the identity of this neurologist is not readily apparent. See Resp't's Br. at 20.

In addition to receiving this history, Dr. Saleh reviewed information generated by other doctors. This other information included the results of tests on Mr. Ridenour's cerebrospinal fluid and the results of the various MRIs, including the thoracic MRI. Exhibit 13 at 2-3. Dr. Saleh examined him with a thorough physical exam. Id. at 3-4. Based upon this information, Dr. Saleh stated that the "etiology [was] to be determined: Likely transverse myelitis." Id. at 7.

Again, the parties dispute the value of Dr. Saleh's diagnosis. The Secretary downplays it because Dr. Saleh did not explain the basis for the diagnosis. Resp't's Br. at 20. Mr. Ridenour emphasizes the perspective of a treating doctor. Pet'r's Reply at 5.

In short, when considered as a whole, the medical records do not provide an easily understood story. The primary gaps are explanations from Dr. Capulong and Dr. Saleh about the bases for their diagnoses of transverse myelitis. This information was potentially available to the parties when they were in the process of developing the evidentiary record.

22

### D.    Ohio Industrial Commission

Initially, in seeking compensation, Mr. Ridenour claimed to have suffered "autoimmune injuries." Exhibit 22 at 928. The first doctor to have performed an independent medical examination, Dr. Erickson, stated that "the diagnosis of autoimmune disorder does not appear to have been made in the medical records." Exhibit 23 at 11.

Then, Dr. Erickson was provided with additional medical records. Dr. Erikson wrote that "neurology specialists indicate that Mr. Ridenour likely does have transverse myelitis." Exhibit 22 at 276. The second doctor, Maria Varveris, stated that Mr. Ridenour's "symptoms are most consistent with the diagnosis of transverse myelitis." Exhibit 22 at 271.

Thus, unlike Mr. Ridenour's present case in the Vaccine Program, the doctors retained in the proceeding before the Ohio Industrial Commission agreed with one another and with Mr. Ridenour that Mr. Ridenour suffered from transverse myelitis. Thus, it is not surprising that Hearing Officer Biery and Staff Hearing Officer Shaw found that Mr. Ridenour suffered from transverse myelitis. The evidence before them differed from the evidence here because the Secretary and Dr. Lancaster are contesting the diagnosis of transverse myelitis.

### E.    Evaluation

Multiple questions prevent an easy resolution of the question of diagnosis based upon the current record. For example, to the extent that the Secretary raises a (fair) point that the basis for Dr. Capulong's and Dr. Saleh's diagnosis of transverse myelitis is unexplained, a potential solution is to seek additional information from them, potentially at a hearing. Likewise, the reports from the retained experts also leave some questions unanswered. Thus, a hearing might have been appropriate to elicit more information from Dr. Souayah and Dr. Lancaster on the issue. See 42 U.S.C. § 300aa–12(d)(3)(B) (authorizing special masters to seek evidence, information, and testimony). However, as the case can be resolved on the issue of causation as discussed next in Section V, a hearing to address diagnosis is not required.

## V.    Analysis of Second Issue --- Causation

When a petitioner, like Mr. Ridenour here, does not claim to have suffered an injury listed on the Vaccine Injury Table, the petitioner must establish that the vaccination was the cause-in-fact of his injury. The elements for a causation-in-fact claim are well known.

23

Petitioners bear a burden "to show by preponderant evidence that the vaccination brought about [the vaccinee's] injury by providing: (1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of a proximate temporal relationship between vaccination and injury." Althen v. Sec'y of Health & Hum. Servs., 418 F.3d 1274, 1278 (Fed. Cir. 2005).[8]

## A.   *Althen* Prong One: Medical Theory

The parties' evidence regarding whether the flu vaccine can cause transverse myelitis falls into three categories.  These are: (1) epidemiologic studies, (2) case reports, and (3) the opinions of the experts.  They are discussed below.

### 1.   Epidemiologic Studies

For a lengthy discussion of the value of epidemiologic studies in the Vaccine Program, see Tullio v. Sec'y of Health & Hum. Servs., No. 15-51V, 2019 WL 7580149, at *5-8 (Fed. Cl. Spec. Mstr. Dec. 19, 2019), mot. for rev. denied, 149 Fed. Cl. 448, 475 (2020); see also P.M. v. Sec'y of Health & Hum. Servs., No. 16-949V, 2019 WL 5608859, at *24-25 (Fed. Cl. Spec. Mstr. Oct. 31, 2019) (finding that epidemiologic studies weighed against finding the flu vaccine can worsen multiple sclerosis); King v. Sec'y of Health & Hum. Servs., No. 03-584V, 2010 WL 892296, at *74 (Fed. Cl. Mar. 12, 2010) ("special masters have routinely found that epidemiologic evidence, and/or other medical journal articles, while not *dispositive,* should be *considered* in evaluating scientific theories") (emphasis in original).

Dr. Souayah challenged a reliance on epidemiology.  Exhibit 40 at 33-35; Exhibit 120; see also Pet'r's Br. at 36-40, Pet'r's Reply at 10-11.  Quoting the 2011 IOM report, Mr. Ridenour argues that "even large epidemiological studies

---

[8] Although the parties agree about the elements of a causation-in-fact, they dispute the requisite level of proof regarding the first prong.  Mr. Ridenour maintains that for the causal theory, his level of proof is only plausibility.  Pet'r's Br. at 24, 40.  In contrast, the Secretary states that the proof of a reliable theory must be persuasive.  Resp't's Br. at 28.

Almost all judges at the Court of Federal Claims have held that the level of proof for Althen prong one is persuasiveness and have rejected plausibility.  See, e.g., Demore v. Sec'y of Health & Hum. Servs., 175 Fed. Cl. 756, 761 (2025) (stating petitioner's argument "an obfuscation and near misrepresentation of the law"); Faulkenberry v. Sec'y of Health & Hum. Servs., No. 19-238V, 2025 WL 1408891, at *707 (Fed. Cl. 2025); Munoz v. Sec'y of Health & Hum. Servs., 174 Fed. Cl. 276, 286 (2024).  But see Hoffman v. Sec'y of Health & Hum. Servs., 172 Fed. Cl. 477, 496 (2024).

may not detect or rule out rare events."  Pet'r's Br. at 37, quoting Exhibit 56 (Stratton) at 10-11.  Similarly, Dr. Souayah submitted a chapter of a textbook about statistics in the health sciences.[9]  According to Dr. Souayah, "This textbook chapter is relevant because the court places great emphasis on epidemiological studies and the chapter discusses the limitations of epidemiological studies." Exhibit 120.

Statements that epidemiologic studies have limitations are fine.  All studies are imperfect in some way.  However, the Secretary is not burdened with presenting evidence that establishes with scientific certainty that a vaccine can never cause an illness.  The Secretary can challenge a petitioner's attempt to establish, on a more likely than not basis, that a vaccine can cause an illness by presenting epidemiologic evidence.  To contest a contention that a flu vaccine can cause transverse myelitis, Dr. Lancaster cited four epidemiologic studies: Baxter, Li, and two by Nordin.[10]  Exhibit B at 11; Exhibit E at 1; see also Resp't's Br. at 34-35.

The Baxter study evaluated vaccines administered from January 2007 to December 2012 to children and adults within the Vaccine Safety Datalink.  Baxter at 3.  The total number of vaccinations was nearly 64 million of which nearly 19 million doses were flu vaccines.  Id. at 9.  The researchers looked for cases of transverse myelitis within two periods: 5-28 days and 2-42 day.  Id. at 4.  The 2-42 day interval was used as a reassurance because the researchers wanted to ensure they were "not missing an increased risk with the same type of vaccine, beyond the shorter 5-28 day exposure interval."  Id.  For both windows (5-28 days and 2-42 days), the researchers found no increase in transverse myelitis frequency.  Id. at 5.

---

[9] Marecello Pagano and Kimberlee Gauvreau, "Hypothesis Testing" in Principles of Biostatistics (2d ed. 2018).

[10] Roger Baxter et al., Acute Demyelinating Events Following Vaccines: A Case-Centered Analysis, 63 CLIN INFECT DIS. 1456 (2012).  Filed in author manuscript form as Exhibit B, tab 3. Citations to page numbers in this opinion correspond to the PDF page of the manuscript.

Rongxia Li et al., Post licensure surveillance of influenza vaccines in the Vaccine Safety Datalink in the 2013 – 2014 and 2014 – 2015 seasons, 25 PHARMACOEPIDEMIOL. DRUG SAF. 928 (2016).  Filed as Exhibit D.

James D. Nordin et al., Monovalent H1N1 influenza vaccine safety in pregnant women, risks for acute adverse events, 32 VACCINE 4985 (2014).  Filed as Exhibit B, tab 4.

James D. Nordin et al., Maternal Safety of Trivalent Inactivated Influenza Vaccine in Pregnant Women, 121 OBSTET. GYNECOL. 519 (2013).  Filed as Exhibit B, tab 5.

The researchers concluded that for transverse myelitis, they found "no evidence of a safety concern." Id. at 6.

While the Baxter study is not dispositive, it does lend support to vaccines not being a known cause of transverse myelitis. See Martinez v. Sec'y of Health & Hum. Servs., No. 16-738V, 2022 WL 4884923, at *30 (Fed. Cl. Spec. Mstr. Sept. 9, 2022) (recognizing that Baxter "contains some methodologic weaknesses . . . [b]ut still undermines petitioners' theory- especially given the degree to which petitioners relied on case reports in the alternative"), mot. for rev. denied, 165 Fed. Cl. 76 (2023); Bender v. Sec'y of Health & Hum. Servs., No. 11-693V, 2018 WL 3679637, at *30 (Fed. Cl. Spec. Mstr. July 2, 2018), mot. for rev. denied, 141 Fed. Cl. 262, 268 (2019); but see J. v. Sec'y of Health & Hum. Servs., 155 Fed. Cl. 20, 47 (2021).

The value of the Li study resembles the value of the Baxter study.[11] Li and colleagues accessed the Vaccine Safety Datalink, which consolidates six healthcare organizations whose enrollees exceeded eight million people in 2010. Li at 929. The researchers searched electronic medical records for instances of seven pre-specified adverse events, including transverse myelitis. They determined which episodes of transverse myelitis occurred 1-21 days after vaccination and compared that incidence to the episodes occurring in a control window. The researchers found "No association" between the flu vaccine and transverse myelitis. Id. at 933. Li tends to undermine the claim that flu vaccines can cause transverse myelitis, although Li is not conclusive.

The remaining two studies (Nordin 2013 and Nordin 2014) can be treated together as they both assessed the risk of vaccination in pregnant women. In both studies, the researchers did not detect any increased risk for neurologic problems, including transverse myelitis. But, given that Mr. Ridenour does not fall into the studied population (pregnant women), the two Nordin studies may not be informative to his case.

---

[11] It appears that special masters have assessed the Li article in only one prior case. Armstrong v. Sec'y of Health & Hum. Servs., No. 20-1221V, 2026 WL 700101, at *6-7 (Fed. Cl. Spec. Mstr. Feb. 12, 2026); id. at *14 (noting that Li "determined that there was no increased risk corresponding with any variant of the flu vaccine," in finding that petitioner had not met her burden under Althen prong one).

2.    Case Reports

Without any epidemiologic evidence that directly connects the flu vaccine with Mr. Ridenour's (assumed) transverse myelitis, Mr. Ridenour relies upon case reports about a flu vaccine preceding the onset of transverse myelitis to support the claim that a flu vaccine can cause transverse myelitis.  See Pet'r's Br. at 25-29 and Pet'r's Reply at 15-16.  This position is flawed because case reports provide little, if any, meaningful information about causation.  At best, they show temporal data but not necessarily that a flu vaccine can cause transverse myelitis.

Various authorities have commented on the value of case reports.  To start, the Federal Judicial Center has published a series of guides designed "to assist judges . . . in reaching an informed and reasoned assessment concerning the basis of expert evidence."  Jerome Kassirer and Gladys Kessler, Reference Manual on Scientific Evidence, Preface (3d ed. 2011) ("Reference Manual").  The guidance from the Federal Judicial Center translates to the Vaccine Program because causation for off-Table injuries in the Vaccine Program is the same as traditional causation.  See Moberly ex rel. Moberly v. Sec'y of Health and Human Servs., 592 F.3d 1315, 1322-23; Shyface v. Sec'y of Health & Human Servs., 165 F.3d 1344, 1351 (Fed. Cir. 1999) ("The absence of elaboration of the law of causation in the legislative history leads us to conclude that the Vaccine Act's requirement of causation in non-Table cases was not viewed as distinct from causation in the tort law.").  For examples in which appellate authorities within the Vaccine Program have cited the Reference Manual, see Germaine v. Sec'y of Health & Hum. Servs., 155 Fed. Cl. 226, 228-29 (2021), and Hart v. Sec'y of Health & Hum. Servs., 60 Fed. Cl. 598, 607 n.20 (2004).

A pertinent guide in the Reference Manual states, "[a]necdotal evidence usually amounts to reports that events of one kind are followed by events of another kind.  Typically, the reports are not even sufficient to show association, because there is no comparison group."  David H. Kaye and David A. Freedman, Reference Manual on Scientific Evidence, Reference Guide on Statistics, at 218.  These authors also state, "some courts have suggested that attempts to infer causation from anecdotal reports are inadmissible as unsound methodology under Daubert."  Id. at 217 n.14 (citing cases).

Within the Vaccine Program, the Federal Circuit has endorsed, albeit indirectly, a view that case reports merit little weight.  In a series of five cases involving autoimmune hepatitis, the (undersigned) special master rejected case reports as evidence of causation.  Porter v. Sec'y of Health & Hum. Servs., No. 99–639V, 2008 WL 4483740, at *13 (Fed. Cl. Spec. Mstr. Oct. 2, 2008).  Under

27

the caption of a different case, a judge at the Court of Federal Claims disagreed with this weighing of evidence. Rotoli v. Sec'y of Health & Hum. Servs., 89 Fed. Cl. 71, 86–87 (2009). When the Federal Circuit reviewed the special master's decision, the Federal Circuit stated that "[t]he special master found that the remaining two articles, both describing single case studies, did not contain any meaningful analysis about causation." Porter v. Sec'y of Health & Human Servs., 663 F.3d 1242, 1253 (Fed. Cir. 2012). The Federal Circuit also stated that the "decision reveals a thorough and careful evaluation of all the evidence including . . . medical literature." Id. at 1254.

The W.C. case contains similar indirect support from the Federal Circuit. W.C. v. Sec'y of Health & Hum. Servs., No. 07-456V, 2011 WL 4537877, at *13 (Fed. Cl. Spec. Mstr. Feb. 22, 2011), mot. for rev. denied on this point, 100 Fed. Cl. 440, 456 (2011), aff'd, 704 F.3d 1352 (Fed. Cir. 2013). At the trial level, the (undersigned) special master declined to rely upon case reports because, among other reasons, "case reports cannot distinguish a temporal association from a causal relationship." Id. at *13. At the Federal Circuit, the appellate court focused primarily upon epidemiologic studies, which undermined the claim that the vaccine significantly aggravated the petitioner's illness. W.C., 704 F.3d at 1360-61. However, at the end of its opinion, the Federal Circuit stated that it "cannot say that the special master's . . . weighing of the scientific evidence was arbitrary or capricious." Id. at 1361.

Much of the foregoing analysis regarding case reports was set forth in K.O. v. Sec'y of Health & Human Servs., No. 13-472V, 2016 WL 7634491, at *11-12 (Fed. Cl. Spec. Mstr. July 7, 2016). After K.O., the Federal Circuit has not discussed case reports in a precedential opinion, leaving Porter and W.C. as the leading, although muted, words on the subject.[12] Consequently, judges from the Court of Federal Claims have tended to defer to the special master's assessment of case reports. See, e.g., Kelly v. Sec'y of Health & Hum. Servs., 160 Fed. Cl. 316, 321 (2022) (indicating that the special master was not arbitrary in finding that case reports have limited or nonexistent value); Rus v. Sec'y of Health & Hum. Servs., 129 Fed. Cl. 672, 682 (2016) (noting the special master could reasonably afford

---

[12] In a non-precedential opinion, the Federal Circuit held that the special master was not arbitrary in denying compensation. Kalajdzic v. Sec'y of Health & Hum. Servs., No. 2023-1321, 2024 WL 3064398 (Fed. Cir. June 20, 2024). In the underlying decision, the special master gave "little weight" to "case reports filed in support of Petitioner's theory." Kalajdzic v. Sec'y of Health & Hum. Servs., No. 17-792V, 2022 WL 2678877, at *23 (Fed. Cl. Spec. Mstr. June 17, 2022), mot. for rev. denied, 2024 WL 4524777 (originally issued Oct. 27, 2022), aff'd, 2024 WL 3064398 (Fed. Cir. 2024).

28

little weight to the medical literature, including case reports).  Exceptions to this trend include Exum v. Sec'y of Health & Hum. Servs., 175 Fed. Cl. 681, 706-07 (2025), and Patton v. Sec'y of Health & Hum. Servs., 157 Fed. Cl. 159 (2021).  But, Exum and Patton do not discuss Porter or W.C.  Instead, both cases ultimately rely upon Paluck v. Sec'y of Health & Hum. Servs., 104 Fed. Cl. 457, 475 (2012).[13]

Mr. Ridenour relies upon J. for his assertion that "case reports enhance the biologic plausibility that flu vaccination can cause TM."  Pet'r's Br. at 25, 27; Pet'r's Reply at 14.  Mr. Ridenour is correct that the Court of Federal Claims in J. characterized a specific set of case reports as having "probative value" and disagreed with the special master's assessment of these case reports compared to the Baxter study.  155 Fed. Cl. at *47.  However, as explained above, this case is not consistent with the assessment of case reports and their value in most cases.

Outside of the Vaccine Program, district courts have examined the value of case reports in the context of claims that drugs or a medical device harmed a person.  Examples include: In re Gardasil Products Liability Litigation, No. 3:22-MD-03036-KDB, MDL No. 3036, 770 F.Supp.3d 893, 2025 WL 854377, at *9 (W.D.N.C. Mar. 11, 2025) (citing, among other cases, Moberly v. Sec'y of Health & Hum. Servs., 592 F.3d 1315, 1323 (Fed. Cir. 2010), for the proposition that "temporal association alone does not equate to 'causal association' particularly in this context where tens of millions of young men and women received the vaccine prior to January 2011"); In re: Abilify (Aripriprazole) Products Liability Litigation, 299 F.Supp.3d 1291, 1309 (N.D. Fla. 2018) ("The difficulty with case reports is distinguishing between association and causation"); In re Tylenol (Acetaminophen) Marketing, Sales Practice, and Products Liability Litigation, 198 F.Supp.3d 446, 461 (E.D. Pa. 2016) ("It is true that case reports and anecdotal evidence alone may not be sufficient support for a causation opinion. . . . However, case reports considered in conjunction with other evidence may be an appropriate

---

[13] Paluck states "case reports 'do not purport to establish causation definitively, and this deficiency does indeed reduce their evidentiary value.  Nonetheless, the fact that case reports can by their nature only present indicia of causation does not deprive them of all evidentiary weight.'"  Paluck, 104 Fed. Cl. at 475, quoting Campbell v. Sec'y of Health & Hum. Servs., 97 Fed. Cl. 650, 668 (2011).  The case Paluck quotes, Campbell, cites to Rotoli v. Sec'y of Health & Hum. Servs., 89 Fed. Cl. 71, 86-87 (2009).  However, the value of the opinion by the Court of Federal Claims seems questionable as the Federal Circuit, as noted above, reversed the outcome in Rotoli, and reinstated the special master's decision, which gave little weight to the case reports.  Porter, 663 F.3d at 1253.  Paluck, which cited Rotoli, was issued before the Federal Circuit reversed Rotoli.

basis for an expert's causation opinion."); In re Mirena IUD Products Liability Litigation, 169 F.Supp.3d 396, 451 (S.D.N.Y. 2016) ("Case reports are generally disfavored by courts as evidence of causation because they merely describe 'reported phenomena without comparison to the rate at which the phenomena occur in the general population or in a defined control group; [they] do not isolate and exclude potentially alternative causes; and [they] do not investigate or explain the mechanism of causation.'") (citation omitted).

Mr. Ridenour discussed case reports showing development of transverse myelitis after the flu vaccination. See Pet'r's Br. at 27-28. As these case reports are part of the record, they must be considered. See 42 U.S.C. § 300aa–13(a)(1) (requiring a special master to evaluate the "record as a whole"). The collection of case reports is listed in the appendix.

Dr. Souayah used case reports to support three assertions: (a) the influenza virus can cause transverse myelitis; (b) other vaccines can cause transverse myelitis; and (c) the influenza vaccine can cause transverse myelitis. Exhibit 40 at 24-28. There are problems with each.

Influenza virus causing transverse myelitis. In this context, Dr. Souayah relies upon either case series or case reports. However, as explained above, this type of evidence is not persuasive. In addition, Dr. Souayah does not explain why what might happen with an infection can be transferred to explain what might happen with an immunization. See Miller v. Sec'y of Health & Hum. Servs., 172 Fed. Cl. 762, 782 (2024) (denying motion for review and finding that the special master was not arbitrary in rejecting a theory about viral invasion because the Fluvirin vaccine contains an inactivated virus); Zamora v. Sec'y of Health & Hum. Servs., No. 21-1414V, 2025 WL 1105282 (Fed. Cl. Spec. Mstr. Mar. 19, 2025), mot. for rev. denied, 178 Fed. Cl. 284 (2025).

Other vaccines causing transverse myelitis. In this context, Dr. Souayah primarily relies upon a case series by Agmon-Levin et al. Exhibit 40 at 26; see also Pet'r's Br. at 25 (citing J. v. Sec'y of Health & Hum. Servs., 155 Fed. Cl. 20, 47 (2021)) and Bryan v. Sec'y of Health & Hum. Servs., No. 14-898V, 2020 WL 7089841, at *21 (Fed. Cl. Spec. Mstr. Oct. 9, 2020)). But, Agmon-Levin is, essentially, a large case series. See Exhibit B at 12. By searching different databases, the researchers identified 37 instances in which transverse myelitis was diagnosed after multiple vaccinations across 39 years. Exhibit 42. Agmon-Levin did not explain how an incidence of approximately one case of transverse myelitis following many types of vaccination per year suggests that the vaccines caused the transverse myelitis. Thus, special masters have given Agmon-Levin little weight.

30

See Nieves v. Sec'y of Health & Hum. Servs., No. 18-1602V, 2023 WL 3580148 at *15 n.21 (Fed. Cl. Spec. Mstr. May 22, 2023) (the "limited findings had to be dredged from a lengthy reporting period, suggesting not just that the injury is rare but that it is preponderantly unlikely"); I.J. v. Sec'y of Health & Hum. Servs., No. 16-864V, 2022 WL 277555, at *5 (Fed. Cl. Spec. Mstr. Jan. 4, 2022); see also Goodwin v. Sec'y of Health & Hum. Servs., No. 16-1676V, 2023 WL 7924657 at *17 (Fed. Cl. Spec. Mstr. Oct. 23, 2023) (summarizing testimony from the Secretary's expert that "four cases out of millions over 40 years is not a statistically significant number").

Influenza vaccine causing transverse myelitis.  For this section, too, Dr. Souayah puts forward case reports.  Exhibit 40 at 26-27.  But, for reasons explained above, case reports are not persuasive evidence. These case reports do not meaningfully demonstrate that the flu vaccine can cause transverse myelitis.  See Whitecotton v. Sec'y of Health & Human Servs., 81 F.3d 1099, 1104 (Fed. Cir. 1996) (indicating that special masters have discretion in how they weigh evidence).

In sum, the epidemiologic study tends to weigh against finding that a flu vaccine can cause transverse myelitis and the case reports contribute little, if anything, to the causation analysis.  However, this literature is not dispositive of the issue.  Therefore, the theories Mr. Ridenour and his expert have put forward are addressed next.

        3.      Expert Opinions

Through Dr. Souayah, Mr. Ridenour brings forward two theories.  These are molecular mimicry and non-specific activation of the immune system.  Pet'r's Br. at 29-32.

        *a)*      *Molecular Mimicry*

Mr. Ridenour and his expert, Dr. Souayah, advance the theory of molecular mimicry to explain how the flu vaccination could cause transverse myelitis. Exhibit 40 at 28-29; Pet'r's Br. at 29-31.  The Secretary disputes the persuasiveness of this theory.

Because special masters are often called upon to evaluate the persuasiveness of the theory of molecular mimicry, the Court of Federal Claims and the Court of Appeals for the Federal Circuit have considered molecular mimicry in their appellate role opinions from special masters.  In December 2019, the undersigned identified the leading precedents as W.C., 704 F.3d 1352, and Caves v. Sec'y of

Dep't. of Health & Hum. Servs., 100 Fed. Cl. 119 (2011), aff'd without op., 463 F. App'x 932 (Fed. Cir. 2012).  Tullio v. Sec'y of Health & Hum. Servs., No. 15-51V, 2019 WL 7580149, at \*12-14 (Fed. Cl. Spec. Mstr. Dec. 19, 2019), mot. for rev. denied, 149 Fed. Cl. 448 (2020).  While Tullio describes those cases in more detail, their essence appears to be that although molecular mimicry is accepted in some contexts, special masters may properly require some empirical evidence to show that a particular vaccine can cause a particular disease.

In the next approximately six years, appellate authorities reviewing decisions involving molecular mimicry have generally endorsed the approach of looking for some evidence that persuasively shows that a portion of a vaccine resembles a portion of human tissue, which contributes to causing the disease, and that the immune system will respond to the relevant amino acid sequence.[14] Chronologically, the list of more recent appellate cases begins with the opinion in Tullio, which denied the motion for review.  149 Fed. Cl. 448, 467-68, 478 (2020).

Another example in which the Court of Federal Claims held that the special master did not elevate the petitioner's burden of proof in the context of evaluating the theory of molecular mimicry is Morgan v. Sec'y of Health & Hum. Servs., 148 Fed. Cl. 454, 476-77 (2020), aff'd in non-precedential opinion, 850 F. App'x 775 (Fed. Cir. 2021).  In Morgan, the Chief Special Master found that petitioner had not presented persuasive evidence about a relevant antibody.  Id. at 477.  The Chief Special Master also noted that the articles about the relevant disease do not list the wild flu virus as potentially causing the disease.  Id.  When examining this analysis, the Court of Federal Claims concluded: "the Chief Special Master did not raise the burden of causation in this case; petitioner simply failed to meet it."  Id.

The Federal Circuit also evaluated the Chief Special Master's approach in Morgan.  The Federal Circuit concluded: "We discern no error in the special master's causation analysis."  850 F. App'x 775, 784 (Fed. Cir. 2021).

Most other recent appellate cases follow this path.  See, e.g., Faulkenberry on behalf of WCF v. Sec'y of Health & Hum. Servs., 176 Fed. Cl. 700, 708-10 (2025) (ruling that a special master's evaluation of whether petitioner substantiated the theory of molecular mimicry did not elevate petitioner's burden of proof); Izard v. Sec'y of Health & Hum. Servs., No. 17-623V, 2025 WL 480936, at \*8 (Fed. Cl. Jan. 27, 2025) ("Simply asserting a causal theory without context or a supportive

---

[14] The term "homology" is used when discussing molecular mimicry.  "Homology" is defined as "the quality of being homologous; the morphological identity of corresponding parts; structural similarity due to descent from a common form."  Dorland's at 868.

factual framework based on medical literature, research, or other evidence is insufficient"); Miller v. Sec'y of Health & Hum. Servs., 172 Fed. Cl. 762, 783 (2024); Stricker v. Sec'y of Health & Hum. Servs., 170 Fed. Cl. 701, 720-21 (2024) (finding the special master did not require scientific certainty in assessing molecular mimicry); Duncan v. Sec'y of Health & Hum. Servs., 153 Fed. Cl. 642, 661 (2021) (finding the special master did not err in rejecting a bare assertion of molecular mimicry); Caredio v. Sec'y of Health & Hum. Servs., No. 17-79V, 2021 WL 6058835, at *11 (Fed. Cl. Dec. 3, 2021) (indicating that a special master did not err in requiring more than homology and citing Tullio); Yalacki v. Sec'y of Health & Hum. Servs., 146 Fed. Cl. 80, 91-92 (2019) (ruling that special master did not err in looking for reliable evidence to support molecular mimicry as a theory); but see Patton, 157 Fed. Cl. at 169 (finding that a special master erred in requiring petitioner submit a study to establish medical theory causally connecting flu vaccine to brachial neuritis).[15]

When evaluating a theory of molecular mimicry, one opinion from the Court of Federal Claims is especially illuminating (even if the opinion is not binding). The Court of Federal Claims explained why petitioners must present some evidence to show the persuasiveness of molecular mimicry as a theory in their cases. Dennington v. Sec'y of Health & Hum. Servs., 167 Fed. Cl. 640 (2023), appeal dismissed, No. 2024-1214, 2024 WL 1255318 (Fed. Cir. Mar. 25, 2024). There, Ms. Dennington alleged that a tetanus-diphtheria-acellular pertussis ("Tdap") vaccine caused her to develop GBS. Id. at 644. She supported her claim with two reports from a neurologist, Carlo Tornatore, who put forward molecular mimicry. Id. at 647-49. The chief special master denied entitlement. Id. at 656.

The Court of Federal Claims denied a motion for review because the chief special master did not commit any error in evaluating Ms. Dennington's prong one evidence. The Court emphasized the lack of evidence supporting Dr. Tornatore's opinion:

- "While Petitioner and Dr. Tornatore put forth the well-established medical theory of molecular mimicry as the mechanism through which the Tdap vaccine could cause GBS, nowhere in Dr. Tornatore's expert reports, nor in Petitioner's briefs, do they specifically tie the Tdap vaccine to GBS through molecular mimicry." Id. at 653.

---

[15] In Doles v. Sec'y of Health & Hum. Servs., No. 2023-2404, 2025 WL 1177875 (Fed. Cir. Apr. 23, 2025), the Secretary's expert did not challenge molecular mimicry.

- "Dr. Tornatore never actually explains how molecular mimicry might occur from the Tdap vaccine specifically, nor does he elaborate on how molecular mimicry could cause the specific autoimmune system reaction that could cause GBS." Id. at 653-54.
- "There is nothing in Dr. Tornatore's report that explains or even alludes to what antigens or structures in the Tdap vaccine could share homology with possible host antigens and how these antigens could react in the manner GBS is believed to progress." Id. at 654.
- "The literature upon which he relies make no mention of any causal connection between GBS and the Tdap vaccine." Id.

Based upon these observations, the Court criticized the lack of specificity in Dr. Tornatore's opinions:

> In fact, because Dr. Tornatore does not offer any specific explanation as to the distinct connection between Tdap, molecular mimicry, and GBS, one could take Dr. Tornatore's causation theory and substitute any table vaccine (e.g., the measles vaccine) and any autoimmune disorder (e.g., autoimmune encephalitis) and Dr. Tornatore's expert report's discussion of molecular mimicry would require absolutely no changes. That is how general his molecular mimicry theory is—it does not matter which vaccine and which autoimmune disorder are plugged in. But *Althen* prong one requires more.

Id.

Based upon this method of analysis, the evidence Mr. Ridenour presents falls short of his burden. When it comes to explaining molecular mimicry, Dr. Souayah's opinion is approximately two paragraphs. See Exhibit 40 at 28-29. He does not identify any immunogenic portion of the flu vaccine that shares homology with a portion of the body impaired in transverse myelitis. See id.; see also Exhibit B at 12 (Dr. Lancaster: Dr. Souayah "did not specify what protein is the mimic of what protein is the human antigen.").[16] Instead, Dr. Souayah analogizes transverse

---

[16] In Dr. Souayah's third report, Dr. Souayah asserts that "There is no requirement in the Vaccine Program to identify a proposed mimic or native protein that is the target in the context of TM." Exhibit 107 at 2. Generally speaking, doctors are retained for the expertise in fields such as neurology. Whether something is a "requirement in the Vaccine Program" is a topic better

myelitis to Guillain-Barré syndrome, which is a demyelinating disease of the peripheral nervous system.  But, the differences between transverse myelitis and Guillain-Barré syndrome may make this comparison less apt.  See Smith v. Sec'y of Health & Hum. Servs., No. 14-848V, 2018 WL 3991386, at *25 (Fed. Cl. Spec. Mstr. July 5, 2018).

### b)    Non-Specific Activation of the Immune System

Dr. Souayah's second theory is that the flu vaccine "could induce tissue damage and the release of sequestered antigens.  These newly exposed antigens . . . may activate new autoreactive lymphocytes in a bystander manner."  Exhibit 40 at 29; see also Pet'r's Br. at 31-32 (repeating Dr. Souayah's report).  The only article Dr. Souayah cites in this context is the Agmon-Levin article.

Perhaps due to the brevity of Dr. Souayah's opinion, Dr. Lancaster's response is also short.  Dr. Lancaster maintains that "Dr. Souayah mentioned the general phenomenon of bystander activation but provided no evidence that this can cause transverse myelitis."  Exhibit B at 12.

The lack of development reduces the value of this theory.  Although literature is not required, Althen v. Sec'y of Health & Hum. Servs., 418 F.3d 1274 (Fed. Cir. 2005), "a scientific theory that lacks any empirical support will have limited persuasive force."  Caves v. Sec'y of Health & Hum. Servs., 100 Fed. Cl. 119, 134 (2011), aff'd without opinion, 463 F. App'x 932 (Fed. Cir. 2012).

### 4.    Synopsis regarding Prong One

Two epidemiologic studies (Baxter and Li) tend to undermine the claim that flu vaccines cause people to develop transverse myelitis.  Although Mr. Ridenour has a fair point that the epidemiologic studies should not be interpreted as saying that the flu vaccine never causes transverse myelitis, these large studies have not detected any increased incidence of transverse myelitis after vaccination.  Mr. Ridenour's attempt to counter the epidemiologic studies primarily relied upon case reports.  But, case reports present little, if any, valuable information about causation.  Finally, the two theories that Dr. Souayah presented, molecular mimicry and non-specific activation of the immune system, lacked sufficient

---

addressed by attorneys.  See Faulkenberry v. Sec'y of Health & Hum. Servs., No. 19-238V, 2026 WL 245531, at *9-10 (Fed. Cl. Spec. Mstr. Jan. 5, 2026).

support to make them persuasive.  Accordingly, Mr. Ridenour has failed to meet his burden regarding <u>Althen</u> prong one.

### B.    *Althen* Prong Three

The timing prong actually contains two parts.  A petitioner must show the "timeframe for which it is medically acceptable to infer causation" and the onset of the disease occurred in this period.  <u>Shapiro v. Sec'y of Health & Hum. Servs.</u>, 101 Fed. Cl. 532, 542-43 (2011), <u>recons. denied after remand on other grounds</u>, 105 Fed. Cl. 353 (2012), <u>aff'd without op.</u>, 503 F. App'x 952 (Fed. Cir. 2013).  Here, on both parts, the parties' positions are not a model of clarity.

### 1.    Medically Acceptable Timeframe

As part of the Expert Instructions, Dr. Souayah was directed to "opine as to the amount of time for which it is medically acceptable to infer causation.  This time is often presented as a range."  Order, issued July 12, 2022, ¶ 6.a.  Dr. Souayah did not comply with this direction exactly.  In his first report, he asserted that an onset interval of four days (discussed below) is appropriate based upon case reports and the Schonberger study of swine flu vaccine and Guillain-Barré syndrome.  Exhibit 40 at 35.

Dr. Lancaster disagreed based upon the number of steps.  He asserted:

> [A four-day] window is shorter than accepted by experts such as Baxter (2016) who used a 5-42-day window.  It is not probable that a vaccine could trigger specific CNS [central nervous system] autoimmunity within 4 days.  There would need to be generation of specific CNS-reactive lymphocytes, proliferation of these cells, migration of the cells into the CNS, and time for effects to occur on target tissue.

Exhibit B at 12.

In briefing, Mr. Ridenour defended the opinion that a flu vaccine can cause transverse myelitis within four days by citing a portion of the 2012 IOM report that discusses the lag phase and logarithmic phase of the adaptive immune response.  Pet'r's Br. at 45-46 & 50, citing Exhibit 56 at 13-14.  Although the Secretary noted Mr. Ridenour's reliance, the Secretary did not directly challenge the lag phase-log phase argument.  <u>See</u> Resp't's Br. at 41-43.

Under these circumstances, the undersigned declines to determine whether the evidence preponderantly favors finding that four days is an appropriate interval for inferring causation. Some additional information would be helpful. For example, does Dr. Souayah agree with the sequence of steps that Dr. Lancaster proposed? And, if so, why does Dr. Souayah assert that these steps can be completed within four days? Moreover, it is not readily apparent whether Mr. Ridenour's exposure to the flu vaccine was his first or repeat exposure.

### 2.     Onset of Neurologic Problems

As set forth in Section IV above, whether the evidence favors a finding that Mr. Ridenour suffered from transverse myelitis is debatable. Thus, determining when his assumed transverse myelitis began is based upon a somewhat hypothetical construct.

As a reminder, Mr. Ridenour received the allegedly causal flu vaccine on December 9, 2019. Exhibit 1 at 1. He first sought medical treatment on December 12, 2019 for perineal pain associated with testicular pain, trouble walking, and difficult and burning urination. Exhibit 6 at 11. Dr. Lancaster opines that this incident marks the onset of Mr. Ridenour's neurologic problems. Exhibit C at 2; see also Resp't's Br. at 41 n.4. Mr. Ridenour disputes this opinion. See Pet'r's Reply at 18.

Instead of agreeing that he manifested a neurologic problem on December 12, 2019, Mr. Ridenour proposes that the first symptom was one day later, on December 13, 2019. Pet'r's Br. at 51. The basis for this assertion is that on December 18, 2019, Mr. Ridenour told Dr. Hageman that he was having pain in his calves for five days that was worse when he walked. Exhibit 7 at 21.

The Secretary's argument that Mr. Ridenour's neurologic problem was present on December 12, 2019 has some credibility. On that date, he reported trouble walking. Although the treating doctor found "no sensory or motor nerve irritation" (Exhibit 6 at 14), Dr. Souayah did not persuasively address why walking trouble is not a manifestation of a neurologic problem. Cf. Pet'r's Reply at 18 ("Respondent fails to produce a single piece of medical literature supporting the argument that perineal pain is a first symptom of another demyelinating illness, TM, or any other illness").

As stated earlier, the onset of Mr. Ridenour's problem blends with an assessment of determining whether Mr. Ridenour suffered from transverse myelitis, which is a complicated question by itself. Then, even if the onset were

found to be three days (not four days), there would need to be a separate analysis as to whether three days is a medically acceptable interval. Finally, even if Mr. Ridenour succeeded in showing the timing between events was sufficient, he would not necessarily be entitled to compensation. Grant v. Sec'y of Health & Hum. Servs., 956 F.2d 1144 (Fed. Cir. 1992) ("Temporal association is not sufficient, however, to establish causation in fact."). For these reasons, the undersigned declines to determine whether Mr. Ridenour has met his burden on Althen prong three.

### C.    *Althen* Prong Two – Logical Sequence

The remaining prong address whether there is a logical sequence of events supporting causation for the petitioner specifically. Because of the previous finding that Mr. Ridenour has failed to meet his burden of proof regarding prong one, any analysis of prong two is unnecessary. See Stricker, 170 Fed. Cl. at 721-22. Nevertheless, the evidence relevant to this prong is discussed if simply to show that the entire record was considered.

Mr. Ridenour has made three points. First, he cites a statement from a treating doctor. Second, he points out that no other cause of his neurologic problem has been identified. Third, he relies upon the outcome of the proceeding before the Ohio Industrial Commission. Pet'r's Br. at 46-50.

Treating Doctor. With respect to the second Althen prong, the Federal Circuit has instructed special masters to consider carefully the views of a treating doctor. Capizzano v. Sec'y of Health & Hum. Servs., 440 F.3d 1317, 1326 (Fed. Cir. 2006). Here, Dr. Saleh stated that Mr. Ridenour's diagnosis was "Likely transverse myelitis which has been reported following flu shots." Exhibit 13 at 24 (Feb. 3, 2021). Dr. Saleh certified that flu vaccination was contraindicated for Mr. Ridenour due to transverse myelitis. Exhibit 116 at 2 (Nov. 19, 2021). Later, apparently in the context of the Ohio Industrial Commission, Dr. Saleh checked "yes" to indicate his opinion that Mr. Ridenour's transverse myelitis was related to the flu vaccination, that other etiologies had been ruled out, and that his responses had been "given to a reasonable degree of medical certainty or probability". Exhibit 34 at 1, 5 (medical source statement, dated June 3, 2022). While potentially probative, the form does not provide space for doctors to explain the basis for their opinions or to elaborate on the process for ruling out other causes. This statement therefore does not tip the balance in Mr. Ridenour's favor. See Doyle v. Sec'y of Health & Hum. Servs., 92 Fed. Cl. 1, (2010) ("Merely conclusory opinions--or ones that are nearly so as unaccompanied by elaboration

of critical premises—will not suffice as proof of causation, no matter how vaunted or sincere the offeror").

Ruling Out Other Potential Causes.  Mr. Ridenour emphasizes that an alternative explanation for his neurologic problem has not been found.  Pet'r's Br. at 48.  This is true.  However, "a simplistic elimination of other potential causes" does not suffice without more "to meet the burden of showing actual causation." Moberly v. Sec'y of Health & Hum. Servs., 592 F.3d 1315, 1323 (Fed. Cir. 2010).

Ohio Industrial Commission.  Finally, Mr. Ridenour contends that because personnel within the Ohio Industrial Commission reviewed the medical records of Dr. Almudallal, Dr. Bambakidis, and Dr. Saleh, as well as the opinion of Dr. Varveris, and allowed his Worker's Compensation claim, the same result should occur here.  In contrast, the Secretary argues that the outcome there should have "little bearing" in the Vaccine Program case.  Resp't's Br. at 40, citing Lamberti v. Sec'y of Health & Hum. Servs., No. 99-507V, 2007 WL 1772058, at *9 (Fed. Cl. Spec. Mstr. May 31, 2007).

The opinion of the hearing officer and the staff hearing officer can be interpreted as finding that the flu vaccine caused Mr. Ridenour's transverse myelitis.  See Exhibit 22 at 71-72 (hearing officer) and 23-24 (staff hearing officer).  The finding that the vaccine did cause a condition is based, at least implicitly, on a finding that the vaccine can cause the condition.  Caves v. Sec'y of Health & Hum. Servs., 100 Fed. Cl. 119, 136 (2011), aff'd without op., 463 Fed. App'x 932 (Fed. Cir. 2012).

Nevertheless, the undersigned declines to give the outcome before the Ohio Industrial Commission much weight for several reasons.  First, as discussed above, the parties were not disputing whether Mr. Ridenour suffered from transverse myelitis.  In contrast, here, Dr. Souayah and Dr. Lancaster greatly dispute diagnosis, which is a foundational part of a petitioner's claim in the Vaccine Program.  Second, it appears that in the Ohio Industrial Commission, the parties did not provide the epidemiologic studies (Baxter and Li) that undermine an opinion that the flu vaccine can cause transverse myelitis.  See Exhibit 22.01 at 19-22 (listing documents).  At best, Dr. Erickson refers to an excerpt from the Johns Hopkins Bloomberg School of Public Health / Institute for Vaccine Safety website, but it appears that this website was not filed.  See Exhibit 22.01 at 80.  Third, in the absence of epidemiologic studies, it appears that the personnel in the Ohio Industrial Commission may have placed greater weight on the case reports. Finally, for a causation-in-fact claim in the Vaccine Program, a finding of entitlement to compensation must be based upon a medical theory causally

39

connecting the vaccine to the injury.  <u>Althen</u>, 418 F.3d at 1278.  But, there is not a similar analysis in the opinions from the Ohio Industrial Commission.  Consequently, due to the difference in evidence and the different elements of compensation, the undersigned declines to follow the opinions from the members of the Ohio Industrial Commission.

For these reasons, the evidence, when considered as a whole, does not weigh so heavily that a finding in his favor is appropriate.

## VI.    <u>Conclusion</u>

A review of the medical records demonstrates that Mr. Ridenour has been plagued by various problems for many years since receiving the flu vaccination in December 2019.  For these maladies, Mr. Ridenour merits sympathy.  Sympathy, by itself, does not lead to an award of compensation.

The evidence does not support a finding that the flu vaccine can cause transverse myelitis.  Thus, whether Mr. Ridenour's various signs and symptoms amount to transverse myelitis is ultimately immaterial to the outcome of the case.

The Clerk's Office is instructed to enter judgment in accord with this decision unless a motion for review is filed.  Information about filing a motion for review, including the deadline, can be found in the Vaccine Rules, which are available on the website for the Court of Federal Claims.

**IT IS SO ORDERED.**

<u>s/Christian J. Moran</u>
Christian J. Moran
Special Master

**Appendix: Case Reports**

N. Agmon-Levin et al., Transverse myelitis and vaccines: a multi-analysis, 18 Lupus 1198 (2009).  Filed as Exhibit 42.


W. Akkad et al., Longitudinally extensive transverse myelitis following vaccination with nasal attenuated novel influenza A (H1N1) vaccine, 67 Arch. Neurol. 1018 (2010).  Filed as Exhibit 44.


R. Bakshi et al., Acute transverse myelitis after influenza vaccination: magnetic resonance imaging findings.  6 J. Neuroimaging 248 (1996).  Filed as Exhibit 47.


I. Korn-Lubetzki et al., H1N1 Vaccine-Related Acute Transverse Myelitis, 13 IMAJ 249 (2011).  Filed as Exhibit 48.


N. Nakamura et al., Neurologic complications associated with influenza vaccination: two adult cases, 42 Intern. Med. 191 (2003).  Filed as Exhibit 46.


N. Sato et al., Acute transverse myelitis and acute motor axonal neuropathy developed after vaccinations against seasonal and 2009 A/H1N1 influenza, 50 Intern. Med. 503 (2011).  Filed as Exhibit 42.


C.Y. Wu et al., Hemorrhagic Longitudinally Extensive Transverse Myelitis, Case Rep. Neurol. Med. 1596864 (2016).  Filed as Exhibit 45.